# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 133

### OCTOBER TERM, A.D. 2020

*October 16, 2020*

TY PUTNAM,

**Appellant**
**(Defendant),**

v.

THE STATE OF WYOMING,

**Appellee**
**(Plaintiff).**

S-20-0027

*Appeal from the District Court of Lincoln County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*

    Office of the State Public Defender: Diane Lozano, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel.

*Representing Appellee:*

    Bridget Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Catherine M. Mercer, Assistant Attorney General.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice.**

[¶1]    A jury found Ty Putnam guilty of two counts of aggravated felony child abuse for injuries he inflicted on a minor child, PS, on November 2 and November 3, 2018.  On appeal, Mr. Putnam claims that the district court erred in admitting evidence related to an incident on September 10, 2018, in which Mr. Putnam admitted to law enforcement officers that he threw a bottle at PS and bruised her head.  Mr. Putnam argues that because this evidence related to a charge dismissed at the preliminary hearing, it was improper to admit it under Wyoming Rule of Evidence 404(b).  We affirm.

## ISSUE

[¶2]    Mr. Putnam presents one issue on appeal, which he states as follows:

> Did the trial court abuse its discretion when it allowed W.R.E. 404(b) evidence from misconduct that was originally charged but dismissed by the circuit court?

## FACTS

[¶3]    In August 2018, Mr. Putnam began living with Morgan Stubblefield and her then four-month old daughter (hereinafter referred to as "PS").  Shortly thereafter, PS suffered several injuries, and by November 3, 2018, she was brought to the emergency room at Star Valley Health in Afton not breathing, and with no vital signs.  Dr. Noel Stibor, a full-time emergency room physician at Star Valley Health, described PS's condition at the time as "[p]robably moments from death."

[¶4]    Examination of PS revealed that there was recent trauma to her brain, which resulted in respiratory arrest.  There was also old trauma to the brain, which the radiologist described as subacute, suggesting a finding of child abuse or non-accidental trauma.  Due to bleeding on the brain, which would have caused death within minutes to days if it continued, PS was life-flighted to Primary Children's Hospital in Salt Lake City, Utah.

[¶5]    Dr. Larissa Hines, a child abuse specialist, was called in to evaluate PS at Primary Children's.  She found bruising on PS's left and right side of her neck, left forehead, the bottom of her left foot, left forearm, inside of her left ear, and scratches or abrasions on the top left side of her head.  Dr. Hines also found two separate impacts to the skull, which caused a skull fracture on the right side, and also caused a subdural hematoma and pooling of blood, as well as a subdural hematoma on the left side of PS's forehead area.  She also found bleeding on the brain, retinal hemorrhaging, severed veins connecting the brain and skull, and a healing fractured collarbone.

1

[¶6]    Dr. Hines diagnosed PS with abusive head trauma, inflicted trauma or child abuse, which is non-accidental abuse of a child.  Dr. Robert Hoffman, Chief of Pediatric Ophthalmology at Primary Children's Hospital, opined that if PS's injuries were accidental, then she "would have had to have been an unrestrained passenger in a 60 mile an hour, head-on, motor vehicle accident or a fall off a building two stories or higher on to concrete."

[¶7]    Agent Roy Warren was employed by the Lincoln County Sheriff's Department, but he was assigned to the Wyoming Division of Criminal Investigation as a task force officer.  On November 4, 2018, he was called to Primary Children's Hospital because of the suspicious nature of PS's injuries.  Upon arrival at the hospital, Agent Warren met with hospital personnel and interviewed Ms. Stubblefield and Mr. Putnam separately.  Agent Warren also seized Mr. Putnam's and Ms. Stubblefield's cellphones as authorized by a search warrant.

[¶8]    At the hospital, Mr. Putnam and Ms. Stubblefield were unable to identify any accidents or other causes for PS's injuries.  Mr. Putnam explained that "he had no idea" how any of PS's injuries occurred.  He said he was not aware of any accidents, falls or drops that could have caused any of her injuries.  Mr. Putnam instead began to hypothesize what might have happened to cause PS's skull fracture, and "said that she had to either have been hit or slammed to the floor," but could not offer any explanation as to who might have done that.  He did admit that he had caused two injuries to PS, one at the end of October by accidentally bumping PS's head trying to get her out of the car, and one in September when he tore PS's tongue flap as he tried to give her a pacifier.

[¶9]    On November 9, 2018, Agent Warren consulted with Detective Travis Lanning with the Sublette County Sheriff's Office about the investigation.  He asked Detective Lanning to perform an extraction of the content of the cellphones seized from Mr. Putnam and Ms. Stubblefield.  Detective Lanning found two images saved in separate places on Mr. Putnam's phone.  The two images were the same photograph, each depicting Ms. Stubblefield holding PS, who was wrapped in a blanket with visible bruising on her head.  However, one image was modified to add writing to it.  It was taken by Ms. Stubblefield and found in a text message thread that was sent from Ms. Stubblefield's phone to Mr. Putnam's phone on September 10, 2018 at 6:29 p.m.  The second image was found in an application, identified by law enforcement as the secret calculator application, in a folder on Mr. Putnam's phone.  It was a reproduction or screen shot of the first image, but with writing stating, "aftermath of a beat down."

[¶10]  The first image was saved on Mr. Putnam's phone at 6:29 p.m., and the second image or screen shot was saved on Mr. Putnam's phone two minutes later at 6:31 p.m.  The screen shot was created while Mr. Putnam's phone was connected to a phone call with Ms. Stubblefield's cellphone.  Mr. Putnam's phone at the time of the call and when the image

was saved appeared to have been located where he worked out of town for a tow company, based on cellular tower data.

[¶11] After obtaining the images and executing the search warrant for the cellphone tower data associated with Mr. Putnam's phone, Agent Warren interviewed Mr. Putnam for a second time on January 15, 2019. During this interview, Mr. Putnam was told that he was not under arrest and that he was free to leave at any time, but he was also advised of his rights. Initially, Mr. Putnam repeated that he did not know how PS was injured or of any accidents or falls that could have caused injury. He also stated initially that he had never dropped PS and that she had never fallen while he was around.

[¶12] As the interview progressed, Mr. Putnam continued to deny that he had any knowledge of how PS suffered her injuries until he was shown the second (modified) photograph.

> Agent Carlson: Okay. What – what do you think – what do you think Morgan would do when she – when she saw that picture of the aftermath of the beat down that was taken out of the calculator app on your phone, right along with that – right along with that folder that says something along the lines – might not be an accurate quote but –
>
> Agent Warren: I'll – I'll make it an accurate quote.
>
> Agent Carlson: Oh, you can make the accurate quote.
>
> Agent Warren: So a file within that secret calculator app that you had on your phone where that picture was, you have another folder that's titled, "Gonna kill this dumb little . . . ."
>
> Mr. Putnam: What?
>
> Agent Warren: And that was erased out of there.
>
> Agent Carlson: So – so –
>
> Mr. Putnam: When was it erased? I mean, I'm just –
>
> Agent Carlson: Ty. Ty. Ty.
>
> Mr. Putnam: I'm not the only one with a thumbprint to my phone.

3

Agent Carlson:  Ty.

Mr. Putnam: Morgan has a thumbprint, too.

Agent Warren: She can get in your phone?

Mr. Putnam: Yeah.

Agent Warren: With her thumbprint?

Mr. Putnam:  Yes. Yeah. I'm telling you, Morgan can put her thumbprint on my thing and log into my phone.

Agent Warren:  Do you want to know when this picture correlates?  The first picture I showed you that you guys . . . .

Agent Carlson: Don't know nothing about.

Mr. Putnam: I know where the picture – I know where the picture is from.

Agent Carlson: Ty.

Mr. Putnam: I mean, I know –

Agent Carlson: Ty.

Mr. Putnam:  – I know the general –

Agent Carlson:  Ty.

Mr. Putnam:  – time frame.

Agent Carlson:  Ty.

Mr. Putnam:  I'm telling you guys, I didn't do it.

*    *    *

Agent Carlson:  Okay.  So let's go –let's go up to the – let's go up to the November 2, that first – when you guys were at the house.  You go upstairs.  I mean, what's – what's going on?  I mean –

Mr. Putnam: She was screaming and nothing – nothing had happened to her until – until after that would make her do that. So the second day –

Agent Carlson: So that first – that first time up here –

Mr. Putnam: Yeah.

Agent Carlson: – show – demonstrate on me what you did. I mean, don't hurt me.

Mr. Putnam: No, I –

Agent Carlson: – but just with your hands, show – show me what you did because unless we can explain this, we can't get you any help.

Mr. Putnam: Yeah. So she was fighting me. And I grabbed her, like that. I didn't – okay. I wouldn't say grabbed her but put my hand on it like that, and stopped her head from moving. And I just squoze [sic] the medicine down –

Agent Carlson: Okay.

Mr. Putnam: – and then she – her eyes went in the back of her head.

Agent Carlson: Ty. Ty.

Mr. Putnam: I'm – I'm telling you the second – until – until this second day, nothing happened to her that should have –

Agent Carlson: Should have done that?

Mr. Putnam: Yeah.

Agent Carlson: Okay. So the second day, tell me what happened.

Mr. Putnam: The cat crawled on her. And I got mad at the cat and I went to hit the cat and I dropped [PS] on the ground. She fell and hit my boot.

5

Agent Warren: Okay. How – how high was that?

Mr. Putnam: I was starting to stand up, so I don't know if – probably like that (indicating).

Agent Carlson: Okay. Where did –

Mr. Putnam: I just moved way too fast and she fell.

Agent Carlson: Okay. So these bruises, the aftermath of the beat down, okay, you're – I'm not buying –

Mr. Putnam: I'm –

                              *    *    *

Agent Carlson: Ty.

Mr. Putnam: – (inaudible) hold on. Had a little buckle that came up from underneath, like that. And when I went like this, it came up and hit her in the face. That's what that one and this one are from (indicating).

Agent Warren: So you know what those are from? So . . . .

Agent Carlson: Ty.

Agent Warren: Even when I showed you the first picture and you said you didn't know, you knew, so why are – why are you hiding that?

Mr. Putnam: Because I was scared. Because I didn't purposely mean to do that to her.

Agent Carlson: Ty, dude, come on now. Hey –

Mr. Putnam: I couldn't really do that.

Agent Carlson: Hey, we're – okay. That – you're – okay. Some things are plausible. Some things are not plausible. Okay? That's not a – that's not from the seat belt. I mean –

Mr. Putnam: It's – it's just a buckle, like that big.

6

Agent Carlson: No, that's not what it's from.

Mr. Putnam: I didn't hit her. I'm telling you, this seat belt buckle hit her.

Agent Warren: Is it from a steel buckle?

Mr. Putnam: Um-hum. It's like a – it's about – it's got, like – the seat belt piece clips in like normal. It's got, like, a little clip deal that you can slip in, like a D ring or something.

Agent Warren: Knocked the shit out of her.

Mr. Putnam: Yeah.

Agent Warren: That's what happened. So then why do you put this? Why do you – aftermath of the beat down?

Mr. Putnam: I don't know.

Agent Carlson: Ty.

Mr. Putnam: I really don't know

Agent Carlson: Let's – let's revisit the second and third. Okay? It doesn't happen –

Mr. Putnam: I didn't (inaudible).

Agent Carlson: It didn't – it didn't – okay. So the shaking, because the blood vessels in the eye, that's – that's not from a – that's not a – that's not a drop, dude.

Mr. Putnam: I was told that it could have been –

[¶13] Regarding the September 10, 2018 incident, Mr. Putnam stated in the second interview:

Mr. Putnam: I couldn't tell you. I – I thought it was the seat belt buckle, to be a hundred percent honest, but I don't know. Maybe – maybe (inaudible) a bottle in there or something. I don't know.

Mr. Putnam: I don't remember shaking her or – honestly, anything besides dropping her that could have caused that. I don't remember doing any, really, like that. I'm guessing I had the bottle in my hand and I tossed it.

Agent Carlson: You bounced a bottle off of her?

Mr. Putnam: Right here, yeah.

Agent Warren: What kind of bottle was it?

Mr. Putnam: Her formula bottle.

Agent Carlson: Okay.

Agent Warren: Did you tell Morgan about that?

Mr. Putnam: No.

Agent Warren: What did you tell Morgan?

Mr. Putnam: I told her I didn't know what happened.

[¶14]   Near the end of the second interview, Mr. Putnam wrote a letter to PS, which stated:

> Dear [PS], I was wrong for what i [sic] did, I was not right in the head. This is not an excuse for why I did what i [sic] did. You will always be different from the other children now. You were hurt very badly because I could not control myself. [PS] you shouldn't have had to go through what i [sic] put you through. Honestly nobody should. While i [sic] do not expect you to accept my apology . . . . I sincerely hope you would find it in your sweet kind heart to look past the monster that was and accept me for the person owning up to my mistakes, and wrong doings. Sincerely Ty Putnam

[¶15]   Following the second interview, Mr. Putnam was arrested and charged with two counts of felony child abuse and three counts of aggravated felony child abuse for acts committed against PS from September 10, 2018 to November 3, 2018. Count 1 alleged that Mr. Putnam threw a bottle at PS and caused bruising on approximately September 10,

8

2018.  Count 2 alleged that Mr. Putnam caused bleeding to PS's tongue flap while putting a pacifier in her mouth on September 16, 2018.  Count 3 claimed that Mr. Putnam broke PS's collarbone as he removed her from her crib between October 15 and November 2, 2018.  Count 4 accused Mr. Putnam of choking PS while he gave her Tylenol on November 2, 2018.  Count 5 alleged that Mr. Putnam dropped and shook PS on November 3, 2018.

[¶16]  After a preliminary hearing, the circuit court dismissed Count 1, which charged the bottle-throwing incident on September 10, 2018.  The record is not clear as to why that count was not bound over.

[¶17]  However, on March 20, 2019, the State gave notice under W.R.E. 404(b) that it would seek to admit evidence concerning the incident in which Mr. Putnam allegedly threw a bottle at PS and bruised her face.  Specifically, the State sought to introduce the part of the interview with law enforcement in which Mr. Putnam admitted to throwing a formula bottle at PS when she was uncooperative with him getting her in and out of the vehicle.  Additionally, the State sought to introduce the original and altered versions of the photograph Ms. Stubblefield had texted to Mr. Putnam.

[¶18]  The State indicated that it sought to introduce the evidence to show Mr. Putnam's criminal intent, knowledge and absence of mistake or accident as permitted by Rule 404(b).  At the 404(b) hearing, defense counsel argued that Mr. Putnam admitted to law enforcement that he threw the bottle at PS, but that the September 10, 2018 charge was not bound over.  Defense counsel also argued that the evidence was unfairly prejudicial and would cause the jury to convict Mr. Putnam based on his character.  The district court orally ruled that the evidence could be admitted.  It applied the 404(b) *Gleason/Vigil* test, and provided a detailed analysis holding that the evidence was admissible to show knowledge and absence of accident.[1]  The district court, when evaluating how clear it was that the defendant committed the prior bad act, stated:

> COURT:  . . . . Well, I've got a statement, at least so far in the proffered evidence, that, Mr. Putnam, you either caused the bruise with either a seat belt or you did it with a bottle.  I don't

---

[1] In its oral ruling the district court granted the State's request to introduce evidence from the September 10, 2018 incident pursuant to W.R.E. 404(b) for the purposes of "knowledge" and "absence of accident." The district court's written order, however, stated "[t]he uncharged prior bad act presented by the State is hereby admitted for the limited purposes of proving intent and absence of mistake at Jury Trial."  Because Mr. Putnam does not challenge whether the evidence was admitted for a proper purpose, we need not consider the purposes for which the evidence was admitted on appeal.  Nevertheless, the district court's oral ruling went through the required *Gleason/Vigil* test to admit the evidence for knowledge and absence of accident, and this Court reviews the district court's decision in accordance with its oral ruling.  *See generally McEwan v. State*, 2018 WY 65, ¶ 8 n.2, 419 P.3d 881, 883 n.2 (Wyo. 2018) ("[A]s a general rule, an unambiguous oral pronouncement prevails over a contrary provision in a written order."); *Frederick v. State*, 2007 WY 27, ¶ 38, 151 P.3d 1136, 1148 (Wyo. 2007) ("When a discrepancy exists between the oral pronouncement and the written order, the oral pronouncement prevails.").

9

know what the jury's going to find. I don't know what they'll believe. Maybe they won't believe any of that. But it appears that it's your own statement that that's what happened. I've not had testimony and if I did, I didn't recollect that I had testimony that the mother stated that you caused the bruise to the child or if it's just your statement but it appears that that's the case.

The second aspect of that, not only the bruise, but I'm going to identify the other bad act of the indication of the words beat and down. I don't know how clear it is yet but it appears from what the testimony has been – and it may not be admissible in the trial because I don't know what's going to be able to be proven as to where it is that you were with your phone at the time that Mr. Warren says that he's got evidence that says somebody ended up adding these words to this photo. If [the State is] unable to prove the nexus of that, this Court reserves the opportunity and the right to deny the admissibility of it because of that. I don't know what [the State] is going to be able to prove on that. [It] didn't present that. But the testimony was that you, apparently, were working with the tow company and you would have been somewhere with your phone. I don't know if that's the case or not but I'm assuming that's the case in the proffer. So I find that it's pretty clear that if you were out on a tow, you had your phone with you at the time this was done, that you're the one who did it.

[¶19] At trial, Mr. Putnam did not object to the two photographs, and they were received. Mr. Putnam likewise did not object to the State introducing Mr. Putnam's letter to the jury. Instead, Mr. Putnam testified that he recanted the statements he made in the second interview, explaining that he made the incriminating statements because he "felt like that was the easiest way to just get [the interview] over with." Mr. Putnam also denied modifying the image or storing it on his phone. He instead recanted his statement about having a secret calculator application on his phone, but testified that he had a folder on his phone that he identified as UnderLock, and he stated he stored images of PS's mother in that folder.

[¶20] After a three-day trial, the jury found Mr. Putnam not guilty of the alleged felony child abuse that related to the injury to PS's tongue flap on September 16, 2018 and the aggravated felony child abuse that related to the fracture of her collarbone on October 15, 2018. It found Mr. Putnam guilty of the aggravated felony child abuse injuries that occurred on November 2, 2018 and November 3, 2018. The district court sentenced him

10

to seven to ten years on the November 2, 2018 incident and ten to twenty years on the November 3, 2018 incident, with those sentences to be served concurrently.

[¶21]  Mr. Putnam timely perfected this appeal.

## DISCUSSION

[¶22]  Mr. Putnam raises a single issue.  He argues that it was error to admit the photos and his statements about them because they related to a charge that was dismissed at the preliminary hearing.  He claims that it was unjust to allow the State to recycle evidence related to dismissed charges as W.R.E. 404(b) evidence, and that this ruling in effect caused the defendant to be partially tried on charges for which he was not arraigned.[2]

[¶23]  The State disagrees and argues that no clear rule of law bars evidence supporting a charge that was dismissed at a preliminary hearing from being admitted under Rule 404(b). It contends that "Rule 404(b) refers to all 'crimes, wrongs or acts' and does not require a conviction or even an arrest for evidence to be admissible."  It also asserts that appellate review of the argument was waived because his counsel did not articulate the same argument at the 404(b) hearing.  However, the State urges that if the Court considers the merits of the argument, it should do so using the plain error standard, rather than harmless error.

[¶24]  We will first address the State's assertion that Mr. Putnam waived any argument and the appropriate standard of review.  We will then turn to whether the district court erred when it admitted the evidence under Rule 404(b).

## A.    Waiver of Appellate Review

[¶25]  The State contends that Mr. Putnam's objection to the 404(b) evidence at trial differs significantly from the argument he raised on appeal.  It correctly contends that "an argument may not be made for the first time on appeal," citing *Davis v. State*, 2018 WY 40, ¶ 32, 415 P.3d 666, 678 (Wyo. 2018).  The State's reliance on *Davis*, however, is misplaced.  The waiver issue in *Davis* did not involve a 404(b) issue.

---

[2] On page 9 of his brief, Mr. Putnam's counsel indicated "[w]hile it was found on Mr. Putnam's telephone, it was not firmly established that he wrote it.  That is the vacuum in which the trial court considered the admissibility."  Mr. Putnam seems to challenge the adequacy of foundation for receiving the two photographs.  At trial, once foundation was laid, Mr. Putnam did not object to the receipt of either the unmodified image or the modified image of PS.  Since Mr. Putnam did not object to the foundation of the images or the images being admitted when they were offered, any appellate review of the issue is barred. *See generally Mayhew v. State*, 2019 WY 38, ¶ 54, 438 P.3d 617, 634 (Wyo. 2019) ("[O]bjections based on the adequacy of foundation must be made when evidence is offered, and the failure to make a timely objection will preclude appellate review.").

[¶26]   In *Vigil v. State*, we held that when there is a timely objection by the defendant to 404(b) evidence, the State is required to justify the evidence as proper under one of the exceptions articulated in Rule 404(b), and in the "absence of an appropriate objection, the accused may raise on appeal a claim of plain error in the admission of evidence of prior bad acts, but it will be incumbent upon the accused to offer case authority specifically foreclosing admission of the evidence under the circumstances of the case." 926 P.2d 351, 355 (Wyo. 1996), *holding modified by Howard v. State*, 2002 WY 40, 42 P.3d 483 (Wyo. 2002).   In *Howard*, we said that "the filing of a pretrial demand for notice of intent to introduce W.R.E. 404(b) evidence shall be treated as the filing of a timely objection to such evidence." ¶ 32, 42 P.3d at 494.  In *Roden v. State*, we expanded upon our ruling in *Howard* and found that "[i]f a demand for notice is to be treated as an objection to the admissibility of W.R.E. 404(b) evidence, it follows that the demand, like other evidentiary objections, must be made in the trial court."  2010 WY 11, ¶ 12, 225 P.3d 497, 501 (Wyo. 2010).

[¶27]   Mr. Putnam did not file a pretrial demand for notice of intent to introduce W.R.E. 404(b) evidence, but the State gave notice of its intent to introduce the original and modified photographs from the September 10, 2018 incident, along with Mr. Putnam's statement that the bruising occurred when he threw a formula bottle at the infant.  The State also requested a hearing on its intent to use the evidence.  We commend the prosecutor for his proactive approach in meeting his ethical obligation to comply with this Court's long-established procedure governing the introduction of 404(b) evidence.[3]  As a result of the State's efforts, Mr. Putnam was able to object to introduction of the evidence, and was able to argue that the charge was not bound over from circuit court and that therefore it should not be received at trial.  Mr. Putnam's counsel provided a complete analysis using the *Gleason/Vigil* test, and he in fact argued that the September 10, 2018 incident was not bound over and was more likely to cause the jury to convict based on his character:

---

[3] Recently, this Court has seen other cases in which demand for notice of Rule 404(b) evidence was made and none was given, yet the State introduced the evidence anyway.  *See, e.g.*, *Blanchard v. State*, 2020 WY 97, ¶ 19, 468 P.3d 685, 691 (Wyo. 2020); *Vinson v. State*, 2020 WY 93, ¶¶ 9, 16-24, 467 P.3d 1009, 1011-14 (Wyo. 2020); *Broberg v. State*, 2018 WY 113, ¶¶ 16-18, 428 P.3d 167, 171-72 (Wyo. 2018).  On appeal, we are then cast adrift without the requisite trial court analysis and left to fend for ourselves with nothing but a prejudice analysis.  *See generally Broberg*, ¶¶ 16-19, 428 P.3d at 171-72 (discussing that even after a proper demand is filed, if the State does not file its notice then the district court is not alerted to the evidentiary issue, and a proper *Gleason* hearing cannot be held thus turning our review to whether there was a prejudicial error).  Consequently, in *Blanchard v. State* we cautioned prosecutors from failing to file the requisite notice of introduction of 404(b) evidence and preventing notice to the district court so it could hold the required *Gleason* hearing prior to admission of 404(b) evidence at trial.  ¶ 20 n.2, 468 P.3d at 692 n.2; *see also Volpi v. State*, 2018 WY 66, ¶ 17, 419 P.3d 884, 890 (Wyo. 2018) ("In our precedent involving 404(b) evidence, we have routinely emphasized the need for pretrial determination of 404(b) evidentiary issues. As we stressed long ago and have regularly repeated: Rulings on uncharged misconduct evidence are too important to be made in the heat and pressure of a trial, with the jury twiddling its thumbs in the next room.") (citations omitted)).

[Defense Counsel]: . . . It's [a] bad act because these – this evidence was actually charged and not bound over, so it's not before this Court but it was charged. And in this case you have an admission, for what it's worth, that the Defendant did that.

\* \* \*

And I think the State has sufficient evidence in each of these allegations to present to a jury without adding something to it to confuse the issue, to have the jury sitting there, thinking, you know, there's this other stuff out there, too. And if there's this other stuff out there, what else might there be? And this person, if he's – has all of these allegations, he's a bad person. And being a bad person, that means he's a guilty person. And I think a bad person being a guilty person comes out of an old case, *Sturgis v. State*, that I don't remember the citation to. But they talked about her bad character and criminal propensity in that case. And the only reason I remember that is I was involved in the original prosecution of it years ago when I was in law school.

But that's our concern, Judge. We object to the State being able to use this September 10 incident. We object to the State being able to use the – any exhibits that refer to it, especially what was introduced today as Exhibit 3, [the modified photograph]. That one is, again, just highly prejudicial given the statement there. And if the jury believes that was, in fact, Mr. Putnam that made the writing on that photograph, they are, I think, going to be more inclined to convict on what they have before them than they would be without that.

[¶28] The record reflects Mr. Putnam in fact made a timely objection to the State's introduction of this 404(b) evidence. Additionally, our precedent establishes that the defendant's objection will be preserved for appeal by simply filing a demand for notice of the State's intent to introduce 404(b) evidence. *Vinson*, ¶ 16, 467 P.3d at 1012 (citing *Broberg v. State*, 2018 WY 113, ¶ 15, 428 P.3d 167, 171 (Wyo. 2018) ("We review challenges to the admission of evidence for an abuse of discretion when an objection has been lodged and a pretrial demand is treated as a timely objection."); *see also Howard*, ¶ 32, 42 P.3d at 494. A requirement that a defendant must articulate a precise basis identical to what is argued on appeal is inconsistent with that precedent. Therefore, we find that Mr. Putnam's counsel made an appropriate objection and did not waive review on appeal.

## B. Evidence Related to the September 10, 2018 Incident

[¶29]  When a timely objection is made to the introduction of 404(b) evidence, as it was here, our review is for an abuse of discretion. *Broberg*, ¶ 16, 428 P.3d at 171 ("Mr. Broberg filed a pretrial demand for disclosure of 404(b) evidence, thereby timely objecting to the introduction of 404(b) evidence and permitting our review for an abuse of discretion."). As already discussed, Mr. Putnam's counsel preserved his objection when he presented argument at the 404(b) hearing, and therefore we review the district court's decision for an abuse of discretion.  *Mayhew*, ¶ 23, 438 P.3d at 623; *Swett v. State*, 2018 WY 144, ¶ 11, 431 P.3d 1135, 1140 (Wyo. 2018).

> A trial court's rulings on the admissibility of evidence are entitled to considerable deference, and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal. The appellant bears the burden of showing an abuse of discretion.

*Swett*, ¶ 11, 431 P.3d at 1140.

[¶30]  Rule 404(b) governs the admissibility of other acts evidence or evidence related to past misconduct by the defendant.  It provides:

> (b) *Other crimes, wrongs, or acts*. – Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

W.R.E. 404(b).  Evidence of other crimes, wrongs, or acts may include, but is not limited to, any conduct which may bear adversely on the jury's judgment of the character of a person, and it is not limited to other crimes. *United States v. Kendall*, 766 F.2d 1426, 1436 n.5 (10th Cir. 1985) ("To fall within the scope of 404(b), an act need not be criminal, so long as it tends to impugn a defendant's character."); *United States v. Scott*, 677 F.3d 72, 78 (2d Cir. 2012) ("Each of our sister Circuits to consider the issue has concluded that Rule 404(b) extends to non-criminal acts or wrongs, and we now join them" and extending Rule 404(b) to acts or wrongs that that tend to impugn a defendant's character); *see also* 22B Wright & Miller, *Fed. Prac. & Proc. Evid.*, Evid. R. 404 (2d ed. April 2020 update)

(discussing "other acts" covers any conduct, good or bad, that tends to show the person's character); 29 Am. Jur. 2d *Evidence* § 400.

[¶31] "A core principle of Wyoming Rule of Evidence 404(b) 'is that the defendant in a criminal case should not be convicted because he is an unsavory person, nor because of past misdeeds, but only because of his guilt of the particular crime charged.'" *Blanchard*, ¶ 18, 468 P.3d at 691 (quoting *Vinson*, ¶ 17, 467 P.3d at 1012). We have recognized that misdeeds of a defendant or other acts evidence "carries an inherent danger for prejudice." *Moser v. State*, 2018 WY 12, ¶ 21, 409 P.3d 1236, 1243 (Wyo. 2018). To guard against that risk, the trial court is required to follow a mandatory procedure, the *Gleason/Vigil* test, for testing the admissibility of 404(b) evidence:

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the probative value of the evidence must not be substantially outweighed by its potential for unfair prejudice; and (4) upon request, the trial court must instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Moser*, ¶ 21, 409 P.3d at 1243-44.

[¶32] On appeal, Mr. Putnam does not argue that the district court admitted the evidence for an improper purpose, or that it was unfairly prejudicial. Instead, he claims that the trial court abused its discretion by admitting evidence pursuant to Rule 404(b) related to "accusations [that] are baseless." His argument suggests that an offer of proof is inadequate under 404(b) if a charge is dismissed at the preliminary hearing, and that it is unjust to allow the prosecution to recycle dismissed charges as 404(b) evidence.

[¶33] The State contends there is no clear rule of law barring evidence from being admitted under Rule 404(b) if it was dismissed at the preliminary hearing. It relies on the district court's analysis, which was as follows:

> THE COURT: The next thing that I want to make clear is I want to make it very clear that this Court has no knowledge – everybody's argued that this was charged and it didn't get bound over. This Court has no idea why it wasn't bound over. I don't know whether it was because the State didn't ask a certain question. I don't know if the State missed an element with the testimony. I don't know if all the witnesses didn't show up. I have no idea why this count was alleged and didn't get bound over. And it's no where in the record. So although both of the attorneys have argued that issue or it's been brought

15

> up, that has nothing to do with this Court's decision in this matter.

[¶34]   As the district court noted, there are many possible reasons why the charge relating to the September 10, 2018 incident was not bound over.  The fact that the charge was not bound over does not necessarily mean that the incident did not occur, and Mr. Putnam never argues that.

[¶35]   While the record does not tell us why the charge for the incident was not bound over, we note that "it is generally recognized that evidence of other crimes, wrongs, or acts [admitted under 404(b)] may include other alleged crimes, even though the charges were dismissed before trial, the records of the defendant's prior offense had been expunged or erased, or the defendant was acquitted of the charges in question." 29 Am. Jur. 2d *Evidence* § 402; 1 Mueller & Kirkpatrick, *Federal Evidence* § 4:28 (4th ed. May 2020 update) ("To begin with, we are talking about *acts* [under F.R.E. 404(b)], so it does not matter whether they were criminal or not, and certainly it does not matter whether they led to charges or convictions. Indeed, even prior criminal acts that led to charges resulting in an acquittal may be proved against the accused. What is important is the nature or quality of the prior act, not its criminality. Thus the act, and it is almost always a misdeed of some sort, need not be criminal, and if it *was* a crime, even if it led [to] conviction, that fact does not insure its relevancy or admissibility."); *see also Cercy v. State*, 2019 WY 131, ¶¶ 32-42, 455 P.3d 678, 689-93 (Wyo. 2019) (finding that intrinsic evidence of acquitted conduct is admissible under W.R.E. 404(b) if it survives a *Gleason/Vigil* analysis at the trial level).

[¶36]   Some courts have reasoned that although a dismissal or acquittal may lessen the probative value of the evidence, such dismissal or acquittal alone does not render the evidence inadmissible since it only establishes the defendant has not been proven guilty beyond a reasonable doubt and evidence of other conduct does not need to be established beyond a reasonable doubt.[4]  *See generally Cercy*, ¶¶ 32-42, 455 P.3d at 689-93; *State v. Jarman*, 604 S.W.3d 24, 44 (Tenn. 2020) ("[W]e bring Tennessee in line with the majority of states by holding that evidence of a defendant's conduct for which he was acquitted in

---

[4] Following dismissal at a preliminary hearing, a prosecutor can refile a new charge on the same evidence, absent any motive to harass the defendant or impermissibly judge-shop to obtain a different result. *Anderson v. State*, 2014 WY 74, ¶¶ 24-25, 327 P.3d 89, 96-97 (Wyo. 2014); *Rathbun v. State*, 2011 WY 116, ¶ 22, 257 P.3d 29, 37 (Wyo. 2011).  As we have recognized, a second examination of the charge is not a trial in any sense and does not implicate any protections afforded by the Double Jeopardy Clause. *Richmond v. State*, 554 P.2d 1217, 1221-22 (Wyo. 1976) ("The rule has long been that one preliminary hearing, unproductive for the State, does not prohibit another. . . . 'Such an examination is not a trial in any sense and does not operate to put the defendant in jeopardy.'") (quoting *United States ex rel. Rutz v. Levy*, 268 U.S. 390, 393, 45 S.Ct. 516, 517, 69 L.Ed. 1010 (1925)); *see also Thompkins v. McKune*, 433 F. App'x 652, 656 (10th Cir. 2011) ("Without risk of a determination of guilt, jeopardy does not attach, and neither an appeal nor further prosecution constitutes double jeopardy. We conclude that jeopardy had not yet attached at the time of [defendant's] preliminary examination. Consequently, his double-jeopardy argument predicated on the dismissal of the . . . charge at that examination must fail.") (internal citations omitted).

a previous trial may be introduced in a subsequent trial on a different charge only after the evidence has met the requirements of Tennessee Rule of Evidence 404(b)."); *State v. Fields*, 299 So. 3d 126, 130 (La. App. 2020) (holding "the district court legally erred in denying the admission of the prior crimes evidence based solely on dismissal or acquittal of the charges" because a prior acquittal does not automatically prevent the State from introducing the acts in a subsequent trial, and the standard of proof for evidence of a defendant's prior acts for which he was acquitted is less than that required for conviction); *People v. Baldwin*, 17 N.E.3d 746, 760 (Ill. App. 2014) ("[T]he mere fact of acquittal does not necessarily mean that defendant did not commit the alleged other offense; instead, it shows that the State was unable to prove every element of its case beyond a reasonable doubt. The fact that the State was unable to prove every element of the other offense beyond a reasonable doubt when that case was brought to trial does not automatically foreclose its subsequent admission as other-crimes evidence against the defendant in a different case; our supreme court has held that the proof of other-crimes committed by defendant need not be beyond a reasonable doubt but rather must be more than a mere suspicion." (internal citation and quotation marks omitted)); *Kinney v. People*, 187 P.3d 548, 554 (Colo. 2008) ("Prior act evidence can be admitted even though the defendant was acquitted of the criminal charges arising out of the act, provided that the trial court is satisfied by a preponderance of the evidence that the prior act occurred and the evidence otherwise complies with the four-prong test for admissibility under [Colorado evidence laws]." (internal citations omitted)); *State v. Smith*, 532 P.2d 9, 10 (Or. 1975) ("Acquittal alone, though it may lessen the probative value of the evidence of the other offense, does not render it inadmissible."); *cf.* 11 Minn. Prac., Evidence § 404.06 (4th ed. Oct. 2020 update) ("If the prior prosecution is not resolved on the merits and is dismissed for reasons such as the unavailability of a key witness, the alleged prior acts can be used if the proper foundation is laid.").

[¶37]   Applying similar reasoning, the United States Supreme Court in *Dowling v. United States*[5] found that admission of evidence from a prior alleged crime pursuant to F.R.E. 404(b), even though there was an acquittal, did not violate the criminal defendants' constitutional rights.   493 U.S. 342, 347-50, 110 S.Ct. 668, 671-73, 107 L.Ed.2d 708 (1990).   It held "that the challenged evidence was nevertheless admissible because [defendant] did not demonstrate that his acquittal in his first trial represented a jury determination" that he did not commit the previous crime. *Id.* at 350, 110 S.Ct. at 673.

[¶38]   Rule 404(b) is not limited to evidence of other crimes which resulted in convictions or an official determination that there is sufficient evidence that a crime occurred on a

---

[5] "In construing Wyoming rules of procedure, where Wyoming and federal rules of procedure are similar, we have repeatedly looked to federal cases construing the federal rule as persuasive authority." *Johnson v. State*, 2009 WY 104, ¶ 14, 214 P.3d 983, 986 (Wyo. 2009) (citing *Bird v. State*, 901 P.2d 1123, 1129 (Wyo. 1995) ("[i]n our interpretation of our Wyoming Rules of Criminal Procedure having their source in the federal rules, we afford great persuasive weight to federal precedent")); *see also McGinn v. State*, 2015 WY 140, ¶ 43 n.11, 361 P.3d 295, 304 n.11 (Wyo. 2015) (Fox, J., specially concurring).

probable cause determination, although such a conviction or determination no doubt facilitates proof of the other offense. *See, e.g.*, *Wiese v. State*, 2016 WY 72, ¶¶ 9-24, 375 P.3d 805, 807-09 (Wyo. 2016) (evaluating evidence under Rule 404(b) from charges dismissed based on the State's failure to prove probable cause when it was admitted as support for the remaining charge); *United States v. Jackson*, 856 F.3d 1187, 1191 (8th Cir. 2017) (allowing evidence of prior dismissed drug distribution charges because the jury could reasonably conclude the act happened and the defendant was the actor).

[¶39] The fact that charges "are dismissed is without independent significance in applying Rule 404(b)," and merely goes to the weight to be given to the evidence. *United States v. Arboleda*, 929 F.2d 858, 867 (1st Cir. 1991) (citing *United States v. Juarez*, 561 F.2d 65, 70 (7th Cir. 1977)); *see also State v. Mongold*, 647 S.E.2d 539, 549-50 (W. Va. 2007) ("Consistent with *Dowling*, we now hold that the fact that a criminal charge against a defendant is dismissed or that he/she is acquitted of the same does not prohibit use of the incident under Rule 404(b) of the West Virginia Rules of Evidence. Consequently, the fact that the felony child abuse charge against Mr. Mongold was dismissed did not prohibit use of the incident pursuant to Rule 404(b)."); *United States v. Reynolds*, 720 F.3d 665, 671 (8th Cir. 2013) (holding evidence that defendant had molested his minor niece admissible in trial for charges of enticement of a minor to engage in illicit sexual activities despite the fact that the State had dismissed the prior molestation charge, because dismissal of the prior charge is not necessarily relevant to whether the molestation took place).

[¶40] Mr. Putnam squarely placed his knowledge, intent and whether PS's injuries were the result of an accident in issue when he denied causing those injuries even though PS was alone with him when such injuries manifested. The evidence of all prior injuries, including the modified photograph, allowed the trier of fact to hear a complete and coherent story of PS's escalating injuries and Mr. Putnam's possible involvement in causing them. Additionally, introducing the modified picture evidence allowed the jury to understand the events that unfolded during the investigation which led Mr. Putnam to change his story to law enforcement and admit to causing PS's injuries, as well as the context of his later recantation.

[¶41] We find no abuse of discretion in admitting evidence surrounding the September 10, 2018 incident on the basis it stemmed from a charge dismissed at the preliminary hearing. Affirmed.